COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Lawrence C. Gottlieb
Jeffrey L. Cohen
Richelle Kalnit

Proposed Attorneys for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
    :
In re     :   Chapter 11
    :
CRABTREE & EVELYN, LTD.,     :   Case No. 09-_____ (___)
    :
    Debtor.     :
    :
------------------------------------------------------------- x

**DEBTOR'S MOTION AND MEMORANDUM OF LAW FOR INTERIM AND FINAL
(I) APPROVAL OF POSTPETITION FINANCING, (II) AUTHORITY TO USE CASH
COLLATERAL, (III) GRANTING OF LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V)
MODIFYING AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

    Crabtree & Evelyn, Ltd., as debtor and debtor in possession (the "Debtor" or "Crabtree"),[1] respectfully represent:

**BANKRUPTCY RULE 4001 CONCISE STATEMENT**[2]

    1. By this motion, the Debtor requests entry of interim and final orders (the "DIP Orders") granting (i) authorization to obtain postpetition financing pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (as amended, the "Bankruptcy

---

[1]     The last four digits of the Debtor's federal tax identification number are 1685.

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the DIP Facility or the Interim DIP Order, as applicable.

Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (ii) approval to use cash collateral pursuant to section 363 of the Bankruptcy Code and (iii) authorization to grant adequate protection pursuant to sections 361, 363(e), 364(c) and 507 of the Bankruptcy Code to the Debtor's prepetition secured lenders (collectively, the "DIP Financing"). Pending a final hearing (the "Final Hearing") on this motion, the DIP Financing will be implemented on an interim basis, pursuant to the terms of the proposed Interim DIP Order, attached hereto as **Exhibit "B"**, as approved by this Court.

2. Material provisions of the DIP Financing are set out at the following sections of the DIP Agreement and, as applicable, the Interim DIP Order:

    (a) Borrowing Limit: $40 million

    (b) Interest Rate: 4% per annum, increasing to 6% upon Event of Default until such Event of Default is cured or waived.

    (c) Maturity: The earlier of (i) February 1, 2010 (or such later date as may be agreed upon by the parties and (ii) the occurrence of an Event of Default.

    (d) Events of Default: Customary for postpetition financing arrangements in retail chapter 11 cases.

    (e) Liens:

        (i) Adequate Protection: Liens on substantially all of the Debtor's assets, as well as super-priority administrative expense claim status, provided however that neither the DIP Liens or super-priority claims shall be satisfied from proceeds of actions arising under chapter 5 of the Bankruptcy Code (except section 549 of the Bankruptcy Code).

        (ii) Carve-Out: accrued and unpaid fees and expenses, pursuant to Budget, through delivery of Carve-Out Notice (as defined in DIP Orders)

    (f) Fees: There are **no fees** associated with the DIP Financing.

3. In addition, the relevant provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the DIP Agreement and the Interim DIP Order:

    (a) ***Grant of Priority or a Lien on Property of the Estate*** (Interim DIP Order, ¶¶ 3, 4, 9);

(b) ***Adequate Protection or Priority for a Claim That Arose Before the Commencement of the Case*** (Interim DIP Order, ¶9);

(c) ***Determination of the Validity, Enforceability, Priority or Amount of a Claim That Arose Before the Commencement of the Case*** (Interim DIP Order ¶ D);

(d) ***Roll-Up*** (Interim DIP Order, ¶2, 8);

(e) ***Waiver or Modification of the Automatic Stay*** (Interim DIP Order, ¶14);

(f) ***Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in Which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit*** (DIP Agreement ¶11);

(g) ***Establishment of Deadlines for Filing a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order*** (DIP Agreement, Line Letter);

(h) ***Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate*** (Interim DIP Order, ¶6); or

(i) ***Release, Waiver or Limitation on Rights under Section 506(c)*** (Interim DIP Order, ¶7).

## II. BACKGROUND

**A. General**

4. On the date hereof (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is authorized to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in this chapter 11 case.

5. Crabtree & Evelyn has evolved from a small, family-run business, to a company with worldwide manufacturing and distribution capabilities, worldwide distribution channels and 126 retail locations in the United States, making it well-known and respected for its English-style elegance. Through a multi-channel sales strategy, including sales through retail, wholesale, export, affiliate and internet channels, the Debtor manufactures and distributes its products worldwide.

6. Founded as a purveyor of fine soaps from around the world, products were first sold under the Crabtree & Evelyn name starting in approximately 1972.[3] During nearly four decades Crabtree & Evelyn has expanded its product offerings from fine soaps to include personal care products and related accessories, fragrances, comestibles (*i.e.*, food products including cookies, teas and jams), products for the home and gift arrangements. The Debtor also sells Vera Bradley (purses and related accessories) products in its retail store locations. Crabtree & Evelyn manufactures and distributes more than twenty-five product lines, including LaSource®, Gardeners, India Hicks Island Living® and Naturals and its products have been frequently mentioned in numerous magazines, including Vogue, Glamour, and Lucky. In 1977, Crabtree & Evelyn opened its first retail store, and its retail business has gradually expanded to include a manufacturing and distribution facility, as well as 126 stores in the United States.

7. Due to business exigencies described more fully below and in the Bestwick Declaration, Crabtree's ongoing viability is contingent upon the execution of certain restructuring strategies within this chapter 11 case. Crabtree has thus sought the DIP Financing set forth in this motion in an attempt to avoid the immediate and irreparable harm it would suffer if it is unable to secure the postpetition financing and is forced to curtail operations. Crabtree has a critical need to obtain credit and use Cash Collateral (defined below) to sustain its ongoing business operations and existence, to allow it to maintain business relationships and confidence with vendors, suppliers, and customers, to meet ongoing business payroll disbursements, maintain employee morale, and to satisfy other working capital and operational needs.

8. Absent immediate access to the DIP Facility (defined below) and use of the Cash Collateral of its Prepetition Lender (defined below), Crabtree would likely have to shut down suddenly, which would cause significant harm to creditors, employees, and other parties in

---

[3] The name of the Debtor is inspired from (i) the crabapple tree, the original species from which all cultivated apple trees have derived, and (ii) John Evelyn, the seventeenth century renaissance Englishman, who wrote one of the first works on conservation of forests and timber.

interest and which would materially impair the ability of Crabtree to successfully emerge from this chapter 11 case as a streamlined and profitable going concern business. Crabtree's Prepetition Lender and the proposed DIP lender have worked with Crabtree to provide it with access to needed liquidity while providing necessary and appropriate protections to the interests of the secured creditors whose collateral will be used to support Crabtree's continued operations and to conduct this case. Approval of the proposed DIP Financing is urgently needed.

B.      **The Debtor's Prepetition Debt Structure**

9.      The Debtor is a party to that certain Grid Note dated April 6, 2009 (the "Prepetition Note"), in favor of KLK Overseas Investments Ltd. ("KLKOI"),[4] a British Virgin Islands based investment holding company. The Prepetition Note provides for a line of credit of up to an aggregate principal amount of $10 million. The Prepetition Note matures on the earlier of (i) December 31, 2010 (or such later date as may be agreed to), and (ii) the occurrence of an Event of Default (as defined in the Prepetition Note). Interest is payable on June 30, 2009 and on a quarterly basis thereafter. The Debtor made an interest payment on the Prepetition Note on or about June 30, 2009 in the amount of $36,667. The Debtor has drawn a total of approximately $8 million on the Prepetition Note. As of the Petition Date, the balance owed under the Prepetition Note was approximately $8,000,000.

10.     Separate and apart from the Prepetition Note, as of the Petition Date, the Debtor is indebted to KLKOI in the amount of $13,731,528 (together with amounts outstanding under the Prepetition Note, the "Prepetition Obligations").

---

[4]     The Debtor is a direct, wholly-owned subsidiary of Crabtree & Evelyn Holdings Limited ("Crabtree & Evelyn Holdings"), a United Kingdom based investment holding company. Crabtree & Evelyn Holdings owns all of the Crabtree & Evelyn foreign trademarks. Crabtree & Evelyn Holdings is a direct, wholly-owned subsidiary of CE Holdings Ltd. ("CE Holdings"), a British Virgin Islands based investment holding company. CE Holdings is a direct, wholly-owned subsidiary of KLKOI. KLKOI is a direct, wholly-owned subsidiary of Kuala Lumpur Kepong Berhad, a Malaysian corporation ("KLK"). KLK is a Malaysian public limited liability company, the stock of which is publicly traded on the Kuala Lumpur stock exchange.

11. The Prepetition Obligations are secured by security interests in and liens on substantially all assets (the "Collateral"), including, without limitation, inventory, receivables, an office building with related parking garage, land and fixtures, and certain other assets of the Debtors, and cash and proceeds of the foregoing. The Prepetition Obligations are oversecured.

### III. JURISDICTION AND VENUE

12. This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

13. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507.

### IV. RELIEF REQUESTED

14. By this motion, the Debtor requests authorization from the Court to obtain postpetition financing up to the principal amount of $40 million (the "DIP Facility") from KLK, as DIP Lender, pursuant to the terms of this motion, the DIP Orders and that certain DIP Grid Note dated June 30, 2009 (the "DIP Agreement").

15. The proposed financing will be provided by KLK, the parent company of the Debtor. There are no fees payable to KLK under the terms and conditions of the proposed financing. Except as set forth herein, the proposed financing will be senior to all obligations under the existing Prepetition Note or in connection with the Prepetition Obligations. As such, the liens created under the DIP Facility are priming liens with respect to liens currently held by the Prepetition Lender. As the liens held by the Prepetition Lender will be "rolled up" into the DIP Facility and will be satisfied in full, the priming liens will not represent an increase in senior debt.

16. Pending entry of a final order approving the DIP Facility (the "Final Order"), the Debtor requests that the Court authorize the Debtor, on an interim basis, to (i) borrow up to $10 million from the DIP Facility, (ii) use Cash Collateral as provided in the Interim DIP Order, (iii)

grant to the DIP Lender the liens and superpriority claims, (iv) provide adequate protection in favor of the Prepetition Lender, (v) approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof: and (vi) schedule the Final Hearing.

## Debtor's Proposed Postpetition Financing

**A.     Need for Postpetition Financing**

17.     As described more fully in the Bestwick Declaration, the Debtor has faced a number of challenges in the last year which together have had a negative impact on its overall financial performance.  Recently, the Debtor has been challenged by declining revenues, the general economic environment, the current poor retail climate, exorbitant occupancy costs, among others.

18.     In response to the Debtor's deteriorating financial performance, management has taken decisive action in an effort to restructure its operations and reduce its overall cost structure.  Specifically, the Debtor took steps to, among other things, substantially reduce its occupancy and administrative costs relative to its retail lease locations by retaining a real estate consultant to negotiate rent concessions with its landlords.  Unfortunately, given the current retail environment and sheer magnitude of vacancies absorbed by landlords around the country, the Debtor has been unable to accomplish its desired level of rent concessions outside of a chapter 11 proceeding.  In addition, the Debtor has reconstituted its senior management. Moreover, in an effort to increase liquidity, the Debtor obtained additional financing in April 2009 from KLKOI, an affiliate of its parent corporation and proposed DIP Lender, KLK. Notwithstanding these measures, leadership changes and strategic initiatives, the Debtor's liquidity position has not improved and additional working capital is urgently needed to continue and sustain operations.

19.     To continue to operate its business in the ordinary course, the Debtor has determined, with the assistance of its financial advisor, Clear Thinking Group ("CTG"), that it requires postpetition financing as described herein.

**B.     The Postpetition Financing Arrangement**

20.     Prior to the Petition Date, the Debtor and CTG explored various sources of postpetition financing, including financing from the Prepetition Lender and unrelated third parties.  In exploring those options, the Debtor recognized that the obligations owed to the Prepetition Lender are secured by substantially all of the Debtor's assets, such that either (i) the liens of the Prepetition Lender would have to be primed to obtain postpetition financing or (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Lender.  It quickly became clear that borrowing from another postpetition lender that required security senior to the Prepetition Lender could only be accomplished on a contested basis.  Moreover, given the generally poor retail climate and economic conditions, the Debtor realized that sources of new capital, if available at all, were significantly more expensive than obtaining postpetition financing from the DIP Lender.  The Debtor found that the pricing and fee structure of any alternative proposal would be less favorable than that offered by the DIP Lender – which does not require the payment of any fees to the DIP Lender on account of the DIP Facility.

21.     In view of these circumstances, the DIP Lender was willing to extend postpetition financing on the terms and conditions described herein and thus prime the prepetition security interests of its affiliate, KLKOI.  Ultimately, the Debtor concluded that the DIP Agreement proposed by the DIP Lender is desirable and has determined that entry into the DIP Agreement addresses the Debtor's working capital and liquidity needs, and should be approved.

22.     The Debtor and the DIP Lender engaged in extensive, good faith, arms'-length negotiations with respect to the terms and conditions of the proposed DIP Facility.  These negotiations culminated in the proposed DIP Agreement, which is attached as **Exhibit "A"**.  Significantly, the DIP Agreement provides the Debtor with immediate access to $10 million in availability, pending this Court's consideration and entry of the Final DIP Order.  This

commitment should allow the Debtor to meet all of its administrative obligations during the early stages of this chapter 11 case.

23. The Debtor and DIP Lender have agreed upon a budget (the "Budget"), annexed hereto as **Exhibit "C"**, projecting cash flows, on an interim basis, for five weeks. The Debtor believes that the Budget is achievable and will allow the Debtor to operate without the accrual of unpaid administrative expenses.

**C.  Liens and Claims Provided in the DIP Agreement**

24. Pursuant to the Interim Order, and upon entry of the Final Order, all loans and obligations under the DIP Facility shall:

   (a) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute superpriority claims against the Debtor, with priority over any and all administrative expenses and all other claims against the Debtor, subject only to the Carve-Out, provided, however, such superpriority claims shall not be payable from any proceeds from avoidance actions, including those arising under sections 544, 545, 547 and 548[5] of the Bankruptcy Code (the "Avoidance Actions"), unless approved in the Final Order; and

   (b) pursuant to sections 364(c)(2)-(3) and 364(d) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests in, and liens upon the Collateral (the "DIP Liens"). The DIP Liens shall prime and be senior in all respects to the existing liens that secured the obligations of the Debtor under or in connection with the Prepetition Obligations.

**D.  The Roll-Up of the Prepetition Obligations**

25. Upon approval at the Final Hearing, the Debtor shall use advances under the DIP Facility to pay in full in cash the obligations arising under and in connection with the Prepetition Obligations and any accrued but unpaid interest, fees and charges due and owing in connection therewith.

26. The roll-up of the Prepetition Obligations into the DIP Facility is necessary as the DIP Lender would not have agreed to provide the DIP Facility without the roll-up. Of course, the

---

[5] Such claims shall be payable from proceeds from avoidance actions arising solely pursuant to section 549 of the Bankruptcy Code.

roll-up remains subject to the review of parties-in-interest including, upon its appointment, an official committee of unsecured creditors, provided in paragraph 6 of the proposed DIP Orders.

**E.     Provisions to be Highlighted Pursuant to Bankruptcy Rules 4001(b)-(c) and 4001-2 of the Local Bankruptcy Rules for the Southern District of New York**

27.     The Debtor believes that the following constitute provisions to be described in according with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York:

(a)     **Roll-Up**:  The roll-up will result in application of proceeds of the postpetition facility to pay, in full, the obligations arising under the Prepetition Obligations (Interim DIP Order, ¶2, 8).

(b)     **Waiver of Section 506(c) Surcharge:**  The Interim DIP Order provides for the Debtor to waive its ability to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code.  The proposed waiver of the estate's rights will be effective only after notice to parties in interest and entry of the Final Order granting such relief (Interim DIP Order, ¶7).

(c)     **Avoidance Actions**:  The Interim DIP Order provides that the neither the DIP Liens, the DIP Superpriority Claims, Prepetition Replacement Lien or Prepetition Administrative Claim will be payable from the proceeds of any Avoidance Actions, except those arising under section 549 of the Bankruptcy Code, unless approved in the Final Order (Interim DIP Order, ¶ 3, 4).

(d)     **Binding the Estate to Validity, Perfection or Amount of Secured Debt:**  Although the Interim DIP Order includes certain stipulations by the Debtor related to the validity, amount and perfection of the prepetition liens, the Interim DIP Order reserves until September 1, 2009 the right of non-debtor parties or a statutory committee to investigate the validity,

perfection and enforceability of the prepetition obligations under the Prepetition Obligations (Interim DIP Order, ¶6).

28. These provisions were thoroughly negotiated and are necessary for the Debtor to effectuate the DIP Facility and procure the financing made available under the DIP Agreement in a sufficient amount and on a timely basis.

**F. Use of Cash Collateral and Proposed Adequate Protection**

29. In order to address its immediate working capital needs and fund its reorganization efforts, the Debtor also requires the use of cash collateral of the Prepetition Lender (the "Cash Collateral"). The use of Cash Collateral will provide the Debtor with the additional necessary capital with which to operate its business, pay its employees, maximize value and successfully reorganize under chapter 11.

30. The Prepetition Lender has consented to the Debtor's use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim DIP Order. The Debtor will demonstrate at the Final Hearing that the proposed adequate protection for the Prepetition Lender satisfies the requirements of sections 363(e) and 3654(d)(1)(B) of the Bankruptcy Code.

31. Under section 363(e) of the Bankruptcy Code, the Prepetition Lender are entitled to adequate protection of their interests in the Collateral, to the extent their liens in the Collateral constitute valid and perfected security interests as of the Petition Date, equal in amount to the aggregate diminution in value of their interest in such Collateral.

32. As adequate protection for any diminution in the value of their Collateral from the Debtor's use of Cash Collateral and the priming of the Prepetition Obligations and the Prepetition Lender's liens, claims and interests in the Collateral, the Prepetition Lender shall be granted a replacement lien on the Collateral (the "Prepetition Replacement Lien"). The Prepetition Replacement Lien shall be subject to the Carve-Out and shall be subordinate only to

the DIP Liens. The Prepetition Replacement Lien shall be valid, perfected, enforceable and effective as of the date of the entry of the Interim DIP Order without any further action by the Debtor or the Prepetition Lender and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or other agreements.

33. In addition to the Prepetition Replacement Lien, the Debtor proposes to, among other things, (i) grant the Prepetition Lender an allowed administrative claim (the "<u>Prepetition Administrative Claim</u>") against the Debtor's estate under section 507(b) of the Bankruptcy Code for the amount by which adequate protection for any diminution in value is insufficient, subject only to the superpriority status of the obligations under the DIP Facility and to the Carve-Out and (ii) make payments to the Prepetition Lender for reasonable fees and expenses incurred before or after the Petition Date.

## V. BASIS FOR RELIEF REQUESTED

**A.    The DIP Facility Should Be Approved.**

34. Approval of the DIP Agreement will provide the Debtor with immediate and ongoing access to borrowing availability to pay its operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtor could be forced to cease operation, which could result in irreparable harm to its businesses and could jeopardize the Debtor's ability to reorganize. The credit provided under the DIP Facility and the use of Cash Collateral will enable the Debtor to continue to satisfy its customers' needs, pay employees, and operate its business in the ordinary course. The availability of credit under the DIP Facility will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor. Finally, the implementation of the DIP Agreement will be viewed favorably by the Debtor's employees and customers, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

35. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 3 64(d). The Debtor proposes to obtain the financing set forth in the DIP Agreement by providing, inter alia, superpriority claims, security interests, and liens pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.

36. The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to borrow up to $10 million under the DIP Facility and to use such proceeds to fund its operations. Despite best efforts, the Debtor has been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (iv) without granting priming liens pursuant to section 364(d). The Debtor has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

37. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtor negotiated with the DIP Lender extensively, in good faith, and at arms'-length. Provided that a debtor's business judgment does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Curlew Valley Assocs., 14 B.R. 506, 5 13-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

38. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

39. Substantially all of the Debtor's assets are encumbered and the Debtor has been unable to procure the required funding absent the proposed superpriority claims and liens. The Debtor submits that the circumstances of this case require the Debtor to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of its sound business judgment.

40. The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms'-length. Accordingly, the DIP Lender and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

B.     **The Court Should Authorize the Use of Cash Collateral.**

41.     In addition to the need for debtor in possession financing, Crabtree's other pressing concern is the need for immediate use of the Cash Collateral pending the Final Hearing on this DIP Motion. Crabtree requires the use of Cash Collateral to be able to pay operating expenses, including payroll, and to pay vendors to ensure a continued supply of goods essential to its continued viability.

42.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Debtor requires the use of the Cash Collateral to fund day-to-day operations.  Indeed, absent such relief, the Debtor's business could be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors.  The interests of the Prepetition Lender in the Debtor's Cash Collateral will be protected by the adequate protection set forth above.  The Prepetition Lender has consented to the use of the Cash Collateral on the terms set forth herein and in the Interim DIP Order.  Accordingly, this Court should approve the request to use Cash Collateral in the operation of the Debtor's business and administration of this chapter 11 case.

C.     **The Court Should Authorize the Debtors to Provide Adequate Protection.**

43.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval. 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code, provides that, upon request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

44.     What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474

(8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The focus of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. 11 U.S.C. § 361; see In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

45. The Prepetition Lender has agreed to the Debtor's use of Cash Collateral and the Debtor's entry into the DIP Agreement in consideration for the adequate protection provided to each of them under the Interim Order. Moreover, the replacement liens, the payment of reasonable fees and expenses of the Prepetition Lender's professionals and other protections offered to the Prepetition Lender will sufficiently protect their interest in any collateral taken as security under the DIP Facility. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and 363(e).

D.   **Modification of the Automatic Stay Is Appropriate.**

46. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender and the Prepetition Lender, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default and after five business days' notice thereof, all rights and remedies under the DIP Agreement, and (iii) implement the terms of the proposed Interim DIP Order and the Final Order.

47. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

### E. Interim Approval of the DIP Facility Should Be Granted.

48. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 and to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable to the debtor's estate, subject to the rights of parties in interest at the Final Hearing.

49. The Court should schedule and conduct a preliminary hearing on the motion and authorize Crabtree from and after the entry of the Interim Order until the Final Hearing to obtain credit under the terms contained in the DIP Agreement and utilize Cash Collateral.

50. The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a Final Hearing on the motion, the Debtor will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtor's vendors, employees, and customers of the Debtor's ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim credit facility would result in accelerated cash demands on the Debtor. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating successful reorganization efforts.

**F. Establishing Notice Procedures and Scheduling Final Hearing.**

51. The Debtor has served notice of this Motion on: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Serene Nanako, Esq.); (ii) Silverman Acampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11573 (Attn: Ronald J. Friedman, Esq.) as counsel for Kuala Lumpur Kepong Berhad; and (iii) the Debtor's 40 largest unsecured creditors. In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

52. No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: July 1, 2009

Respectfully submitted,

By: /s/ Lawrence C. Gottlieb
    Lawrence C. Gottlieb

COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Lawrence C. Gottlieb (LG 2565)
Jeffrey L. Cohen (JC 2556)
Richelle Kalnit (RK 3728)

Proposed Attorneys for Debtor and Debtor in Possession